UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| TAMMY ROSE WOODYARD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 17-277-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is pending for consideration of cross-motions for summary judgment filed by Plaintiff Tammy Woodyard ("Woodyard" or "the Claimant") and Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("the Commissioner"). [Record Nos. 7, 9] Woodyard argues that the Administrative Law Judge ("ALJ") assigned to her case erred in concluding that she was not disabled within the meaning of the Social Security Act ("Act'). Specifically, she asserts that the ALJ failed to properly consider the opinion of her treating physician. Woodyard requests that this matter be remanded with instructions that she be awarded benefits. Woodyard has also filed a motion for leave to file a reply memorandum in support of her motion. [Record No. 10]

The Commissioner contends that the ALJ properly evaluated the evidence and that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons that follow, the Claimant's motion for summary judgment will be granted, in part, and the matter will be remanded for further consideration. The Claimant's motion for leave to file a reply memorandum will be denied, as additional briefing is not needed to resolve this matter.

## I.

Woodyard filed a Title II application for a period of disability and disability insurance benefits ("DIB") on July 15, 2014. [*See* Administrative Transcript, hereinafter "Tr.," 152-53.] She alleged an onset of disability date of November 6, 2013. [Tr. 152, 42] After the application was denied initially and on reconsideration, Woodyard requested a hearing before an administrative law judge. [Tr. 113-14, 119, 130] She appeared before ALJ Dennis Hansen at a hearing in Middlesboro, Kentucky in April 2016. [Tr. 68-87] ALJ Hansen denied benefits in a written decision on June 17, 2016, which the Appeals Council affirmed. [Tr. 49-58, 1-4] Accordingly, the Claimant has exhausted her administrative remedies and this matter is ripe for review under 42 U.S.C. § 405(g).

## II.

Woodyard was 42-years-old at the time of the ALJ's decision. [*See* Tr. 71, 58] She worked at Wal-Mart for more than 15 years, where she processed items that had been returned. [Tr. 72-73] Her position required her to unload items from shopping carts, place them on pallets, shrink-wrap the pallets, and load the pallets on a truck weekly. [Tr. 73] Woodyard estimated that she lifted or carried up to 50 pounds. *Id.* She testified that she stopped working in 2013 because she was no longer able lift, stand, squat and bending in performing her duties. [Tr. 73-74]

Woodyard reported that her inability to work was caused by rheumatoid arthritis, osteoarthritis, systemic lupus erythematosus, osteoporosis, Raynaud's phenomenon, mixed connective tissue disease, sleeping problems, moodiness and anxiety. [Tr. 208] When questioned about her inflammatory arthritis, Woodyard testified that her hands were most affected and that she was unable to grip. [Tr. 74-75] She also reported that her fingertips turn

blue and she has no feeling in them. [Tr. 78] Woodyard reported that the severity of her symptoms fluctuated, but her hands had not been "normal" for a long time. [Tr. 75] She also reported swelling in her knees and feet, which limited her ability to bend or squat. [Tr. 76, 81] Woodyard testified that lupus had also "affected [her] lungs." She testified that she had suffered from pleurisy about three times and that the condition had been treated with prednisone. [Tr. 76-77] She reported that her use of prednisone had caused swelling in her face and that she had gained approximately 45 pounds since she began taking the medication. [Tr. 81]

At the time of the hearing, Woodyard believed that she could stand or sit for thirty minutes before changing positions. [Tr. 79] She believed she could lift "five pounds, maybe." Woodyard reported driving, but did not help with the cooking and cleaning, other than occasionally loading the washer or dishwasher. [Tr. 72, 80, 205] She accompanied her husband to the grocery store and sometimes out to lunch. [Tr. 80] Woodyard reported that, on a normal day, she watched television to pass the time. *Id.* The only social activity she reported was visiting her mother. [Tr. 205]

Gina Bingham, M.D., was Woodyard's primary care physician and provided treatment beginning in December 2009. Bingham treated Woodyard for hypertension and occasional problems such as a cold or urinary tract infection. [Tr. 414, 422, 434] Bingham performed testing in May 2013 which revealed that Woodyard had osteoporosis. [Tr. 428, 487] Bingham also ordered an "arthritis workup," which was positive for ANA, "Smith AB," and rheumatoid

factor.[1]  [Tr. 476, 479]  She referred Woodyard to a rheumatologist, Mansoor Ahmed, M.D., based on these results.  [Tr. 476]

Ahmed saw Woodyard for the first time on September 13, 2013, noting that she presented with "bilaterally asymmetric polyarthritis," which caused pain and tenderness in the joints of both hands, wrists, knees, and toes of both feet.  [Tr. 282-83]  Ahmed prescribed Plaquenil at Woodyard's next visit in October 2013. [Tr. 288]  The following month, Amhed increased the dosage, noting that Woodyward had "+1 synovitis" at the metacarpophalyngeal joints and wrist.  [Tr. 291]

Woodyard requested a second opinion.  It appears that this request was triggered, at least in part, by Ahmed's refusal to provide Woodyard with a work excuse.  [Tr. 463, 582] Bingham referred Woodyard to Shannon Florea, M.D., in November 2013, but it is unclear if Woodyard ever saw Dr. Florea.  [Tr. 463, 582, 587]  Woodyard began treating with another rheumatologist at the University of Kentucky, Thomas Howard, M.D., in December 2013.  [Tr. 685]  Howard noted that Woodyard suffered from fatigue but, other than valgus knees, her joints appeared normal.  [Tr. 583-84]  By July 2014, Howard described Woodyard as having systemic lupus erythematosus, with manifestations of arthritis including pleurisy and "+ANA, SM, [and] RnP."  [Tr. 630]  She presented with a maculopapular rash involving her feet and hands and reported that methotrexate was not helping her joint pain.  *Id.*  Howard described Woodyard's digits, nails, joints, bones, and muscles as abnormal, with tenderness upon

---

[1] Blood tests for lupus include the anti-nuclear antibody (ANA) and anti-Smith antibody tests. https://www.hopkinslupus.org/lupus-tests/lupus-blood-tests/  (last visited March 15, 2018). Rheumatoid factor and ANA tests assist in the diagnosis of rheumatoid arthritis. https://www.mayoclinic.org/tests-procedures/rheumatoid-factor/about/pac-20384800  (last visited March 15, 2018).

palpation of her fingers. [Tr. 632] Other symptoms included shortness of breath with prolonged standing or walking up stairs. [Tr. 625]

Woodyard also began taking prednisone to manage her symptoms. She experienced a significant increase in pain and swelling when she tried to taper off of that medication. [Tr. 652] She tried another medication (Imuran) without much success. *Id.* In March 2015, Woodyard had been using prednisone again due to increase hand and wrist pain, with an erythematous rash overlying the dorsal aspects of her hands. [Tr. 643, 646] Despite her fear of injections, Woodyard began treatment with Humira. [Tr. 649] By May 2015, Woodyard still suffered malaise and fatigue, but the rash on her hands was improving. [Tr. 641] Although Howard did not detect synovitis during that visit, he noted that the arthritis was not controlled without prednisone. *Id.* Woodyard was advised to keep her entire body warm. *Id.*

Woodyard had tapered off prednisone and was "doing well overall" in July 2015, but still had some hand joint pain and new bilateral foot swelling. [Tr. 662] She also developed a new rash on her chest. This was thought to be caused by the Humira, so she discontinued it. [Tr. 692] A few months later, her rash had worsened and spread to her upper arms. [Tr. 692] Although her hand pain was "tolerable," she advised Howard that she felt best while taking prednisone and she resumed taking a tapered dose of that medication. [Tr. 695] Woodyard followed up with Howard in February 2016 and reported pain in her hands, wrists, and knees that was "much better" while taking prednisone. [Tr. 686] Howard counseled Woodyard regarding the risks associated with chronic use of prednisone including avascular necrosis of bone and osteoporosis. [Tr. 689]

Howard provided a medical source statement on February 9, 2016. [Tr. 683] He indicated that Woodyard's symptoms were severe enough to frequently interfere with attention

and concentration and that her maximum tolerance for sustained, reliable work activity was less than eight hours. *Id.* He also opined that Woodyard would be able to sit, stand, or walk for less than one hour in an eight-hour work day, and that she would rarely or never be able to carry under 10 pounds. [Tr. 683-84] Howard also believed that Woodyard needed to lie down on a daily basis and that she had limitations when it came to reaching, handling, and fingering. [Tr. 684] Specifically, he reported that she could occasionally grasp, turn, and twist objects with her hands, as well as reach overhead with her arms. *Id.* However, he stated that she could never perform fine manipulations with her fingers. *Id.* Finally, Howard believed that Woodyard's symptoms would be likely to interfere with her work attendance more than six days per month. *Id.*

State agency consultant Donna Sadler, M.D., reviewed Woodyard's file and on February 11, 2015, provided an opinion regarding her functional abilities. [Record No. 107-12] Based on her review of the medical records up to that point, Sadler reported that Woodyard could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds. [Tr. 108] She opined that Woodyard could stand, walk, or sit for about six hours in an eight-hour workday. *Id.* She believed that Woodyard's ability to push and pull was unlimited and that she could climb stair and ramps frequently. *Id.* She also reported that Woodyard could stoop and kneel frequently and climb ladders, ropes, and scaffolds occasionally. *Id.* Although Sadler felt that Woodyard's ability to reach overhead was unlimited, she believed that her gross and fine manipulation were limited. [Tr. 108-09] Further, she believed Woodyard should avoid concentrated exposure to extreme cold, extreme heat, and vibration. [Tr. 109]

ALJ Hansen determined that Woodyard did not have an impairment or combination of impairments that met a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. He concluded,

however, that Woodyard had the following severe impairments: mixed connective tissue disease, inflammatory arthritis, lupus, osteoarthritis and Reynaud's syndrome. After considering the entire record, the ALJ found that Woodyard had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except

> she could lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit for six hours in an eight-hour workday and could stand and/or walk for six hours in an eight/hour workday. She can frequently climb ramps and stairs, stoop, kneel, crouch, crawl, handle, finger, and feel bilaterally. She can occasionally climb ladders, ropes or scaffolds, and should avoid concentrated exposure to extreme heat, extreme cold and vibration.

The ALJ determined that Woodyard was capable of performing past relevant work as a claims supervisor, but Woodyard asserted that she actually performed the work at the heavy exertion level. [Tr. 56] The ALJ went on to determine that there were other jobs existing in the national economy that Woodyard was able to perform. Accordingly, he concluded that she had not been under a disability during the relevant period. [Tr. 57]

### III.

Under the Act, a "disability" is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)). A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 20 C.F.R. § 404.1520(a)(4)). If the claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with respect to the fifth step. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that she is not engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(c). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, she will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 404.1520(d). Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination of the disability based on medical evaluations and current work activity, the Commissioner will review the claimant's RFC and relevant past work to determine whether she can perform her past work. 20 C.F.R. § 404.1520(e). If she can, she is not disabled. 20 C.F.R. § 404.1520(f).

Under the fifth step of the analysis, if the claimant's impairments prevent her from doing past work, the Commissioner will consider her RFC, age, education, and past work experience to determine whether she can perform other work. If she cannot perform other work, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(g). "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'" *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)).

This Court's review is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ employed the proper legal standards in reaching her decision. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is such relevant evidence as reasonable minds might accept as sufficient to support

the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). The Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g).

## IV.

ALJs must follow certain standards in assessing the evidence supplied in support of a claim for social security benefits. For instance, greater deference generally is given to the opinions of treating physicians than the opinions of non-treating physicians.[2] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d at 242. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record, 'then it will be afforded controlling weight.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion is not given controlling weight, the ALJ must consider a number of factors in determining how much weight is appropriate. *Id.* These factors include: "the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Id.*

In the event a treating physician's opinion is not given controlling weight, the ALJ is required to provide good reasons for the amount of weight given to the treating source's opinion. 20 C.F.R. § 1527(c)(2). This permits meaningful review of the ALJ's decision and allows a claimant to understand the reasons for the ALJ's decision. *Wilson*, 378 F.3d at 544-45. A decision denying benefits "must contain specific reasons for the weight given to the

---

[2] This rule applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527.

treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, *5 (1996).

Here, the ALJ assigned "marginal weight" to Howard's opinion because the "extreme limitations" he assessed were not consistent with the "conservative treatment" he provided to Woodyard. Woodyard contests this point because she contends that conservative treatment (*i.e.*, non-surgical treatment) is the only treatment available for her inflammatory conditions. *See Thomas v. Colvin*, No. 0:14-CV-129-JMH, 2015 WL 1281701, *6 (E.D. Ky. March 20, 2015) ("'Conservative treatment' is used to refer to non-surgical treatment options, like injections, not to indicate less or fewer incidents of treatment."). The ALJ did not indicate what type of surgery or more invasive treatment might be indicated, given the Claimant's diagnoses.

The ALJ also stated that the limitations assessed by Howard were inconsistent with his treatment notes, which revealed "generalized control of symptoms." [Tr. 56] The ALJ's explanation for failing to afford Howard's opinion controlling weight leaves something to be desired. While the ALJ did discuss some of Howard's later treatment notes indicating that Woodyard's symptoms had improved during that time period, there is no indication that he considered the length, frequency, nature, and extent of the treatment relationship or Howard's specialization. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Further, the ALJ did not provide specific reasons for assigning marginal weight to Howard's opinion. The ALJ's general assertion that Howard's opinion was not consistent with his treatment notes, which cover a two-year period, is largely incapable of meaningful review. *See Fisk v. Astrue*, 253 F. App'x 580, 586 (6th Cir.

2007) (meaningful review impossible where ALJ's reasoning did not indicate that ALJ realized the nature and extent of treating relationship).

In assigning "predominant weight" to the opinion of state agency consultant Sadler, the ALJ concluded that her opinion was "supported by the objective evidence of record that establishes the [C]laimant suffers from mixed connective tissue disease, lupus, inflammatory arthritis, osteoarthritis and Reynaud's syndrome, but evidences a generalized control of symptoms resulting from said conditions." [Tr. 55] Sadler reviewed Woodyard's file on February 11, 2015, approximately one year before Howard provided his medical statement. [Tr. 110, 685] Accordingly, Sadler reviewed an incomplete file which did not include Howard's opinion or the last year of his medical notes.

It is well-established that, in appropriate circumstances, opinions from state agency medical consultants may be entitled to greater weight than the opinions of treating sources. SSR 96-6p, 1996 WL 374180, *3. One such circumstance is where the consultant's opinion is "based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.* But where a consultant's opinion is based on an incomplete record, the ALJ must at least concede that fact before giving greater weight to the state consultant's opinion. *See Blakley v. Comm'r*, 581 F.3d 399, 409 (6th Cir. 2009) (citing *Fisk*, 253 F. App'x at 585). Here, the ALJ did not acknowledge that the consulting source's opinion was based on an incomplete record that did not include the treating physician's medical source statement.

The shortcomings in the ALJ's analysis do not amount to harmless *de minimis* procedural violations. *See Blakley*, 581 F.3d at 409 (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)). First, there is no evidence that Howard's opinion is "so patently deficient

that the Commissioner could not possibly credit it." *Id.* Howard saw Woodyard on several occasions over a substantial period of time and relied on both subjective and objective data in his treatment plan. He cited her various diagnoses, confirmed by positive diagnostic tests in support of his opinion. [Tr. 683] Additionally, the Commissioner has not complied with the spirit of § 1527(c)(2) by satisfying "the procedural safeguard of reasons." *See Wilson*, 378 F.3d at 544-45. As previously stated, the ALJ has not provided specific reasons for disregarding Howard's opinion and, essentially, adopting Sadler's. Accordingly, the Court is unable to engage in a meaningful review and cannot conclude that the Commissioner's decision is supported by substantial evidence.

V.

Based on the foregoing analysis, it is hereby

**ORDERED** as follows:

1. Plaintiff Woodyard's Motion for Summary Judgment [Record No. 7] is **GRANTED**, in part, to the extent that she seeks a remand for further administrative proceedings.

2. Defendant Berryhill's Motion for Summary Judgment [Record No. 9] is **DENIED**.

3. Plaintiff Woodyard's Motion for Leave to File Reply Memorandum [Record No. 10] is **DENIED**.

4. The decision of Administrative Law Judge Dennis Hansen is **REMANDED** for further administrative proceedings consistent with this opinion and pursuant to sentence four of 42 U.S.C. § 42 U.S.C. 405(g).

This 16th day of March, 2018.



Signed By:
*Danny C. Reeves*  DCR
United States District Judge